IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2017 Session

**STATE OF TENNESSEE v. HENRY LEE JONES**

**Appeal from the Criminal Court for Shelby County**
**No. 03-06997      W. Mark Ward, Judge**

_____

**No. W2015-02210-CCA-R3-DD**

_____

Defendant, Henry Lee Jones, was convicted of two counts of premeditated first degree murder and two counts of felony murder for his role in the 2003 murders of two Shelby County citizens. The jury sentenced Defendant to death for each murder. Defendant now appeals from these convictions and sentences. Defendant argues that the trial court erred by allowing Defendant to represent himself and committed other errors with regard to the provision of elbow counsel; the trial court erred by declaring a witness unavailable and allowing testimony from that witness regarding a prior bad act; the trial court erred by admitting photographs of the victims' bodies and wounds; the State utilized improper closing argument; the evidence was insufficient to support the convictions; the trial court erred in denying Defendant a mitigation expert or investigator in preparation for sentencing; and the death sentence is arbitrary and disproportionate. After a thorough review of the record and the applicable law, we affirm Defendant's convictions and sentences of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

James E. Thomas (on appeal) and James M. Gulley (elbow counsel at trial), Memphis, Tennessee, for the appellant, Henry Lee Jones.

Herbert H. Slatery III, Attorney General and Reporter; Leslie R. Price, Assistant Attorney General; Amy Weirich, District Attorney General; Tom Henderson and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## PRE-TRIAL PROCEEDINGS

Defendant was previously tried and convicted of two counts of premeditated first degree murder and two counts of felony murder and subsequently sentenced to death by a Shelby County Jury for the deaths of Clarence and Lillian James. The convictions and sentences were affirmed by this Court on direct appeal. *State v. Henry Lee Jones*, No. W2009-01655-CCA-R3-DD, 2013 WL 1697611, at *1 (Tenn. Crim. App. Apr. 18, 2013). However, the Tennessee Supreme Court ordered that the convictions and sentences be set aside and the matter remanded to the Criminal Court of Shelby County for a new trial because the court determined that admission of evidence that Defendant committed an out-of-state murder was reversible error. *State v. Jones*, 450 S.W.3d 866 (Tenn. 2014).

On remand, pursuant to Rule 13 of the Tennessee Supreme Court Rules, Defendant was appointed two attorneys. Shortly after appointment of counsel, Defendant became dissatisfied with his attorneys and filed a "Pro Se Motion to Withdraw/Waive Court Appointed Attorneys." After a court appearance on this motion, which included questioning of Defendant, the trial court entered an order granting Defendant the relief he sought and releasing the attorneys appointed to represent him. At every subsequent court appearance, the trial court repeatedly informed Defendant of his right to representation and asked Defendant to accept court-appointed counsel. Defendant persistently declined representation. As the matter proceeded to trial, Defendant repeatedly complained about discovery issues, so the trial court quite astutely arranged for a meeting in the courtroom to allow Defendant to see and review every item of discoverable material from the State. The meeting was set for April 2, 2015, but Defendant refused to participate and instead filed a pro se motion to waive his appearance on April 2, 2015. After appearing in the trial court, Defendant refused to look at the discovery material provided and was once again admonished by the trial court to accept counsel. Defendant continued to refuse counsel and refused to view the discovery items available to him. The case proceeded to trial where Defendant represented himself and had access to elbow counsel for assistance.

## GUILT PHASE

Margaret Coleman was the daughter of the sixty-eight-year-old victim, Lillian James. In 2003, Mrs. James typically rode the bus to work at Methodist University Hospital. Ms. Coleman and her brother often picked Mrs. James up from work and drove her to the home in Bartlett that she shared with her eighty-one-year-old husband, the second victim, Clarence James.

On the night of August 22, 2003, Ms. Coleman arrived at her mother's place of work to drive her home but was informed that Mrs. James did not come in to work that day. When Ms. Coleman attempted to contact her mother and was unable to reach her,

she drove to her mother's home to check on her and Mr. James. When she arrived, the front door was partially open, and there were linens, papers, and other items strewn about the house, which was ordinarily neatly maintained. Ms. Coleman called out for her mother and received no response, so she dialed 911 and waited outside until police arrived.

Officer Phillip Devers of the Bartlett Police Department was the first officer to respond to the scene. Ms. Coleman met him in the driveway. She was "distraught," and informed Officer Devers that both her mother and Mr. James should be in the house. Officer Devers entered through the front door, initially thinking that "this was probably the neatest[,] cleanest house [he] had ever been in." When he looked to his left, he could see down the hallway where he observed parts of the residence in disarray. Specifically, he saw an open linen closet with the linens spilling out of the closet onto the floor. In one bedroom, the mattress was "cattycornered on the box springs of the bed", and there was an open chest of drawers with articles removed and hanging from the drawers. Further down the hall, he entered the master bedroom where he saw two bare feet, "soles up, like somebody was l[]ying face down in the floor." Mrs. James was lying face down in a very large pool of blood. Her throat was cut and "it was apparent that she was gone." Her head was almost completely severed from her body. At this point Officer Devers drew his weapon, retraced his steps, exited the residence through the front door and got on the radio and asked for assistance.

After backup arrived, Officer Robert Allen and Officer Devers entered the house in order to "clear" the residence. Ms. Coleman informed officers that both Mrs. James and her step-father, Clarence James, should be in the house. The officers entered the dining area and observed a lamp on the table with part of the electrical cord cut off. When the officers went through the kitchen, Officer Devers saw some knives lying in the sink. Officer Devers tried to open the door to the utility room. The door only opened about a foot and a half before stopping. When he "peeked" his head around the partially opened door he saw Mr. James lying face down "with his arms bound behind his back in a pool of blood with his throat cut." Again, it was "apparent that [Mr. James] was dead." Officer Devers and several other officers "cleared" the upstairs of the residence and then assisted in securing the crime scene.

Dr. Karen Chancellor, a forensic pathologist and Chief Medical Examiner for Shelby County, Tennessee, testified as an expert at trial.[1] Dr. Chancellor did not perform the autopsies on the victims, instead basing her testimony upon autopsies performed by

---

[1] During the testimony of Dr. Chancellor, Defendant requested that elbow counsel take over. Dr. Chancellor's testimony took place near the end of the trial. Elbow counsel also gave the closing argument in the guilt phase.

- 3 -

other doctors. Autopsy photographs were entered into evidence over the objection of Defendant.

According to the autopsy report, Mrs. James was 5'6" tall and weighed 184 pounds. She suffered from two large cut wounds on both the right and left sides of her neck caused by a knife or sharp object. Internally, the cut wounds injured both the left and right jugular vein and the carotid artery and the knife continued to make cut marks on the spine. There were additional superficial cuts on the neck. Cuts to the major blood vessels of the neck would have caused bleeding outside the body. In addition, Mrs. James had contusions on the right, front side of the neck and both shoulders as well as cuts on both forearms and petechial hemorrhages around both eyes. The noted bruises and petechial hemorrhaging around the eyes were consistent with rope strangulation. Dr. Chancellor opined that Mrs. James died from a combination of sharp force injuries of the neck which resulted in massive hemorrhage or bleeding and asphyxiation, also called strangulation. Mrs. James also had an impression in the skin on her finger that was consistent with wearing a ring on that finger. According to Ms. Coleman, Mrs. James owned jewelry that she wore daily and jewelry that she wore to church. Mrs. James always wore a diamond pendant necklace, a diamond cluster ring, another diamond ring, a gold bracelet and a watch.

Clarence James, on the other hand, was 81 years old, 5'9" tall and weighed 137 pounds. Mr. James had a large cut wound on the neck, petechial hemorrhaging in both eyes, bruising on the left shoulder and both forearms and a superficial cut wound on the forearm. Internally, the hyoid bone in the neck was fractured and there was a stab wound in the neck in addition to the incised cutting wounds from the knife. The stab wound punctured the larynx which would have led to asphyxiation due to blood loss from the stab wound. Mr. James had multiple rib fractures including six ribs on the right side and five ribs on the left side. In addition to the rib fractures, Mr. James had multiple fractured vertebrae. The combination of the fractured hyoid bone, fractured ribs and fractured vertebrae indicated massive compressive force applied to Mr. James's body. Utilizing photographs, Dr. Chancellor was able to explain the differentiation between the stab wound and the wound in the neck. Additionally, photographs of the broken ribs were used to demonstrate the compressive force consistent with either mechanical force, such as being struck with a piece of equipment, or physical force, consistent with stomping the victim, that would have resulted in the broken ribs. Dr. Chancellor opined that Mr. James's death resulted from a combination of sharp force injuries to the neck, multiple blunt force rib fractures to the chest and a compressive injury to the neck resulting in strangulation.

Gretta Thompson drove by the residence of the victims sometime between 7:00 and 8:00 a.m. on the morning of August 22, 2003. She claimed to have seen Mr. James in his garage with two African American males. Christopher Stallion, an employee with

the City of Bartlett, passed by the victims' residence at approximately 12:40 p.m. on August 22, 2003, and also saw Mr. James outside with two African American men.

Justin Franklin Turberville[2] lived at the same apartment complex as Defendant at the corner of Sycamore View and Bartlett Blvd. After passing by the crime scene and seeing reports of the crime which included photographs of Defendant, he contacted the police. Mr. Turberville informed police he saw Defendant at the apartment complex where he lived on the Friday of the weekend that the murders occurred. Mr. Turberville's wife saw Defendant walking down the street the same day.

Defendant visited his niece, Diane Armstrong, at her home near Bartlett around that same time period. Mrs. Armstrong worked as the assistant manager of a Burger King in Arlington, Tennessee. Her husband, Wesley Joseph Armstrong, was the general manager of the restaurant. Defendant informed Mrs. Armstrong that he went to the Burger King looking for her husband, but Mr. Armstrong was out running an errand. Defendant told her if anybody "pull a gun on you and make you get in the car, you're dead already before you get in there." She found this statement strange and called her husband to tell him Defendant would be coming to his Burger King. Mrs. Armstrong called the Burger King and was informed that her husband was not at work; however, she told Defendant that Mr. Armstrong wanted Defendant to return to Burger King. Mrs. Armstrong walked Defendant to his car and saw a young African American man in the car, later identified at Tevarus Young.

Defendant drove to Burger King where Mr. Armstrong, who had returned to the Burger King, came outside to meet him. Defendant was driving a white Dodge Aries. There was a man in the vehicle, whom Mr. Armstrong did not know but described as a skinny African American with braids in his hair. Mr. Armstrong gave food to Defendant and Mr. Young and did not see them again. Mr. Armstrong was initially questioned by the police as a possible suspect in this crime, but after giving a statement, he was no longer investigated.

Detective Kevin Thompson worked the crime scene at the James residence and assisted in taking pictures and videos of the crime scene. Detective Thompson was also a financial crimes investigator, and in addition to collecting photographic and video evidence, he conducted a search of the victims' residence for financial documents. He discovered documents pertaining to credit cards, including a First Tennessee debit card in the name of Lillian V. Wilson (the maiden name of Mrs. James). Detective Thompson determined the debit card was used on August 22 at a Citgo gas station on Sycamore

---

[2] The transcript heading identifies this witness as Joseph Turberville. The transcribed testimony states the name as Justin Franklin Turberville, and his September 17, 2003 statement that was entered as an exhibit at trial identifies him as Jody Tuberville.

View in Memphis, Tennessee; on August 22 in Batesville and Madison, Mississippi; on August 23 in Gulfport, Mississippi; and August 24 in Melbourne, Florida. Detective Thompson travelled to Batesville, Mississippi, to visit a used car dealership where Defendant purchased a white Lincoln Town Car with the victim's debit card.

David Neyman, a former detective with the Bartlett Police Department, obtained video from the gas stations where Mrs. James's debit card was used. Detective Neyman reviewed the video from the gas station on Sycamore View near the scene of the murders and was able to make out the silhouette of a "very slender" African American male with a "high afro." The video from the Shell Station in Batesville, Mississippi, showed a Dodge Aries in the area of the gas pumps between 7:45 p.m. and 8:00 p.m. on August 22. The driver of the car from the Batesville video was not identified. However, the video from the gas station in Madison, Mississippi, showed an African American man wearing a light-colored baseball cap, a yellow shirt, and shorts exiting a white Lincoln Town Car at approximately 11:00 p.m. Detective Neyman observed that as the driver of the Lincoln was leaving, a Dodge Aries immediately pulled out behind the Lincoln on the roadway.

Michael Smith, part-owner of a used car dealership in Batesville, Mississippi, testified that just prior to closing on Friday August 22, 2003, two men entered the business wanting to purchase a car. He described one man as African American with a tear drop tattoo on his face below his eye. This man identified himself as Henry Lee Jones. Another man accompanied Defendant, but Mr. Smith did not have any contact with him. Defendant first spoke to Mr. Smith's father about buying a car. Mr. Smith's father made the deal with Defendant to purchase a white 1993 Lincoln Town Car for $3200. Mr. Smith completed the paperwork. Prior to paying for the car in cash, Defendant excused himself and went to the restroom where Mr. Smith could hear him counting money out loud to himself. The bill of sale contained the signatures of both Mr. Smith and Defendant. In addition, Defendant signed a buyer's guide and a privacy disclosure. Mr. Smith obtained a copy of Defendant's driver's license as part of the sale. Defendant returned to the lot a few days later to correct a problem with the title. At that time, Mr. Smith was not present, but someone else at the business assisted Defendant with the title. Defendant told the person that he had driven back from Florida to fix the title.

Detective Carlos Joseph Reyes of the Brevard County Sheriff's Department in Melbourne, Florida, initiated a traffic stop on Monday, August 25, 2003. As Detective Reyes was driving southbound on Interstate 95, he noticed a white Dodge Aries in his rear view mirror that was driving "very erratic," approaching at a high rate of speed, and cutting off other vehicles. The car eventually pulled behind the detective's vehicle and began tailgating him. Detective Reyes was in an unmarked car, so he decided to warn the driver by flashing his blue lights. After driving a few more miles, the driver began

exhibiting the same behavior, so Detective Reyes slowed down, got behind the vehicle, and conducted a traffic stop of a white Dodge.

Detective Reyes informed the driver of the reason for the stop and asked the driver for his driver's license and other documents. The driver told the officer that he was following his step-father, who was driving a white Lincoln Town Car. Detective Reyes recalled seeing the Lincoln Town Car pass him earlier as he "was merging onto [I]nterstate 95." The driver did not have a driver's license but provided Detective Reyes a name and date of birth. Upon searching for the name provided, Detective Reyes did not receive any useful information. Shortly thereafter, the Lincoln Town Car pulled up behind Detective Reyes's car. Detective Reyes identified Defendant as the driver of the Lincoln. Defendant started to get out of his vehicle, but Detective Reyes instructed Defendant to remain in the vehicle. Defendant told Detective Reyes that he owned the Dodge. Defendant claimed he met the driver through a friend and that he paid the driver to drive the car to Ft. Lauderdale for him. Defendant showed Detective Reyes his driver's license and documentation verifying that he had just purchased the Lincoln. By that point, backup had arrived on the scene. Detective Reyes asked the other officer to run Defendant's name through the computer database. Detective Reyes testified Defendant did not have any outstanding warrants and that his license was valid.

When Detective Reyes asked the driver of the Dodge to divulge his real name, he stated his name was Tevarus Young. The detective discovered Mr. Young had an outstanding warrant from Broward County and arrested him. Detective Reyes told Defendant that he would not have the Dodge towed but that Defendant needed to leave while the officers completed the paperwork. Detective Reyes instructed Defendant to return for the vehicle in twenty minutes. Defendant did not return for the vehicle.

Detective Johnny Lawson of the Melbourne, Florida police department received a be on the lookout ("BOLO") from Bartlett, Tennessee, after a debit card belonging to Mrs. James was used just outside of Melbourne, Florida, at a gas station. The BOLO also referenced a white Lincoln Town Car. Detective Lawson was able to secure a photograph from the gas station where the debit card was used in which a Lincoln Town Car was identified. Later, while working a case in Ft. Lauderdale, Florida, Detective Lawson observed a white Lincoln in a parking lot of Dependable Temps. He took pictures of the vehicle and ran the plates through the Florida system. The vanity plates were registered to Defendant. Detective Lawson also received information that the Lincoln Town Car was involved in the traffic stop conducted by Detective Reyes on August 25. With this information, Detective Lawson contacted the Bartlett Police Department to advise them of his findings with regard to both Defendant and Mr. Young, including the fact that Mr. Young was currently incarcerated in Florida.

Both the Lincoln Town Car and the Dodge were soon located in Florida. Defendant was arrested in Florida. Detective Joseph Massey of the Bartlett Police Department executed a search warrant on the Lincoln Town Car and the Dodge Aries. The Lincoln was registered to Defendant and the Dodge Aries was registered to Defendant and Sherry Robinson. As a result of these searches, a ring identified as belonging to Mrs. James was found in the back seat of the Lincoln. Additionally, Mr. Young was in possession of rings that belonged to Mrs. James at the time of his arrest.

In response to the information received from Detective Lawson, Detective Massey travelled to Florida and accompanied Detective Lawson to the Broward County Jail to interview Mr. Young.[3] The officers conducted three interviews. During the first interview, Detective Lawson did not think that Mr. Young was telling the "truth." When confronted, Mr. Young's "demeanor changed drastically," he became "extremely upset" and "violently sick" but gave information in regards to the Bartlett murders. The second interview took place the next night. Mr. Young "was not real happy" to be participating but gave "more information" before again turning "violently ill, crying uncontrollably." Despite his reaction, Mr. Young continued to provide information about the deaths of Mr. and Mrs. James.

The trial court determined that Mr. Young was unavailable to appear as a witness for trial. A transcript of his testimony from Defendant's first trial was read to the jury. Mr. Young first met Defendant when Mr. Young was homeless and sleeping in a park in Fort Lauderdale, Florida. Defendant introduced himself as "Bam Bam" and offered to pay Mr. Young for oral sex. Mr. Young agreed, got into the car, and went with Defendant on a series of errands culminating in driving "to some warehouses where [Mr. Young] performed oral sex on him." Afterward, Defendant continued to drive and provide for Mr. Young over the course of several days. They visited two acquaintances of Defendant in Daytona, Florida, called "Toosie" and "Tawana." Defendant left with Toosie, and Mr. Young spent the night with Tawana. Although Mr. Young claimed that he wanted to stay in Daytona, Defendant convinced him to leave for the stated purpose of visiting some of Defendant's relatives. Although he did not know where they were going, Mr. Young recalled that Defendant drove for "[m]aybe a day, a day and a half." Mr. Young fell asleep during the latter part of the trip, and when he awoke he was alone in the car, which was parked in front of a Burger King restaurant in Bartlett, Tennessee. Mr. Young went inside the Burger King and saw Defendant having a conversation with an employee. A different employee brought them some food, and after their meal, Defendant drove to a nearby apartment complex and parked his vehicle.

---

[3] Midway through the State's case in chief, Defendant was allowed to present the testimony of John Berrena, an employee of the Broward County Sheriff's Office in 2003. Mr. Berrena testified that he served as a liaison to the two Bartlett Police Department detectives when they came to his department in 2003 as part of their investigation of the murders of Mr. and Mrs. James. He testified that he did not prepare a report in conjunction with his work because he was not part of the investigation.

Mr. Young and Defendant got out of the car and encountered an elderly African American man, later identified as Mr. Clarence James, who was sitting in his garage. Defendant said, "Hey, Pops, how are you doing?" Mr. James then informed Defendant that he had just been released from the hospital and was waiting for a man to come and mow his lawn. Mr. Young offered to mow the lawn for Mr. James, but Mr. James asked only that he move the lawnmower from the front yard to the back yard.

Mr. Young moved the mower to the back yard, looked at a few statues and a bird bath, and drank some water from a faucet in the backyard. When he returned to the front yard, the garage door was closed, and no one was outside. He knocked on the front door, but no one came to the door. The door was unlocked, so Mr. Young entered the house. As Mr. Young walked inside, he saw Defendant walk around the corner with rags and a rope in his hands. Mr. Young saw blood on the items. Mr. Young followed Defendant to the second room where he saw an "old lady," later identified as Mrs. James. Defendant threw Mrs. James on the floor and said, "old lady, old lady, you know what time it is?" Mr. Young watched Defendant tie Mrs. James's hands behind her back with a rope and demand her purse. Mrs. James told Defendant that her purse was in the other room. Defendant told Mr. Young to sit down, and he sat in a chair next to the door. While Defendant was gone from the room, Mrs. James asked Mr. Young if they were going to kill her. Mr. Young told her that Defendant had said they were relatives, and Mrs. James denied it.

Defendant returned to the room with a purse and told Mr. Young to stand up. When Mr. Young complied, Defendant emptied the contents of the purse in the chair. Mrs. James told Defendant that her son was supposed to be coming over, and Defendant replied that if he did, he would "get the same thing you're going to get." Defendant then picked Mrs. James up and pushed Mr. Young out of the way and into another room. Defendant threw Mrs. James on the floor and put a rope around her neck. Defendant put his foot on the back of her neck and strangled her. Defendant then took out a knife from his side and cut Mrs. James multiple times. When Mr. Young asked Defendant why he had killed Mrs. James, Defendant said she had seen his face.

After killing Mrs. James, Defendant left the room. Mr. Young heard cabinets "slamming." Defendant returned with a brown plastic bag and instructed Mr. Young to hold the bag. Defendant put the rope and rags inside the bag and instructed Mr. Young to follow him. They went into the laundry room where Mr. James was dead and lying in a puddle of blood. Mr. James was also bound. Defendant removed the rope and put it in the bag. They then went into the bathroom where they ran water inside the bag. Defendant snatched the bag out of Mr. Young's hands and went into another room where he put a billfold and other items inside the bag. Defendant went room by room taking

items, including a coin in the room where Mrs. James was lying and the rings that the woman was wearing.

Defendant and Mr. Young left the house and returned to the vehicle. Defendant drove to a gas station and used a credit card from the billfold that he took from the house to pay for gas at the pump. After they left the gas station, Defendant threw cards and papers from the billfold out of the window. He also gave Mr. Young $1500 in cash, and the rings that Mrs. James had been wearing. Defendant drove to a mall where they both purchased shoes at Foot Locker and clothes from JC Penney. Defendant purchased a yellow Tommy Hilfiger long-sleeve shirt. They paid for their items with cash. Mr. Young used the money Defendant gave him to purchase his clothing. After leaving JC Penney, Defendant instructed Mr. Young to change his clothes and throw his old clothing out the window.

Defendant placed the hook bladed knife that he had used to kill the victims on the console of the car between the two of them. Defendant told Mr. Young that he had the knife for a long time and instructed Mr. Young to touch it. Mr. Young said that after he touched the knife, Defendant told him to swear that he would not tell anyone about what happened. Defendant warned Mr. Young, "if you ever tell somebody what happened I'm going to kill you and cut your dick off."

While Defendant was driving, he passed a car dealership and turned the car around. Defendant purchased a Lincoln Town Car at the dealership. He gave the keys to the Dodge Aries to Mr. Young and instructed Mr. Young to follow him. They drove to a grocery store where Defendant purchased screws for the license tag. Defendant got a tag out of the trunk of the Dodge and put it on the Lincoln.

Mr. Young followed Defendant for several hours. During that time they stopped for gas two or three times. Each time, Defendant paid for the gas using a credit card at the pump. They stopped at a rest stop where they purchased food and drinks. Mr. Young locked the doors of the Dodge and got into the Lincoln. Mr. Young maintained that as he was about to fall asleep, Defendant forced himself on him and raped him. They next stopped to see Toosie and Tawana. Mr. Young was doing drugs, and Defendant and Toosie left. After Defendant returned, he and Mr. Young left and drove south.

Mr. Young was stopped by an officer in Florida for speeding. He explained he had found the courage to attempt to flee from Defendant. Mr. Young flashed his lights at other vehicles and swerved in the lanes. The driver of one of the cars that he flashed his lights at was a police officer, who then pulled him over. Mr. Young told the officer that he had neither a license nor registration and gave the officer a false name and social security number. Defendant then pulled up behind the officer and talked to him. Mr.

Young was arrested on an outstanding warrant. Mr. Young admitted he was in possession of Mrs. James's rings when he was arrested.

Mr. Young admitted he lied to the police when they first questioned him because he was scared. He was incarcerated and charged with two counts of facilitation of first degree murder at the time of trial but denied that he received any threats or promises in exchange for his testimony.

After receiving information that Defendant had been arrested in Florida, Detective Lawson took a statement from Defendant in which he denied any involvement in the crimes. Defendant informed Detective Lawson that he drove from Ft. Lauderdale, Florida, to Batesville, Mississippi, where he purchased the Lincoln Town Car. Defendant left the car at the dealership until he and Mr. Young came back later and picked up the Lincoln. Defendant stated he did not go to Bartlett but returned to Florida where he stopped at a "girlfriend's" in Daytona. Defendant left Mr. Young and the Dodge Aries at the girlfriend's while he went to Orlando. Defendant claimed that he kept the keys to the Dodge while he went to Orlando. Defendant's statement referenced the traffic stop and arrest of Mr. Young. Detective Lawson identified Defendant as the man he interviewed in Florida.

Elbow counsel for Defendant presented the testimony of Florence Jones, the sister of Mrs. James. Ms. Jones testified that sometime after eleven o'clock in the morning on Friday, August 22, 2003, she spoke with Mrs. James on the telephone. Defendant elected not to testify.

The jury convicted Defendant of two counts of first degree murder and two counts of first degree murder in the perpetration of robbery.

PENALTY PHASE

At sentencing, Defendant maintained his desire to proceed pro se. Specifically, Defendant stated that he did not want to participate in the sentencing phase of the trial at all and wanted to waive the opportunity to put on mitigating evidence. After extensive examination of Defendant, the trial court continued to allow Defendant to represent himself for purposes of sentencing and Defendant again reiterated that he was waiving the presentation of any mitigating evidence.

The State introduced certified copies of five prior violent felony convictions from the state of Florida. These convictions included two counts of battery on a law enforcement officer, one count of aggravated burglary, one count of robbery, and one count of kidnapping. The State presented the testimony of Russell Bausch, an assistant state's attorney for Brevard County, Florida. Mr. Bausch prosecuted Defendant for the

August 26, 2003 murder of Carlos Perez. The State presented the testimony of Detectives Johnny Lawson and Scott Dwyer who both participated in the investigation of the Carlos Perez murder in Florida. The State presented testimony from family members of Mr. and Mrs. James regarding the impact of their deaths on the family. At the conclusion of the State's proof, Defendant was asked "will there be any defense proof?" Defendant responded, "No, sir, the defense will be waiving."

After deliberation, the jury unanimously found five statutory aggravating circumstances for the murder of Mrs. James: (1) Defendant was previously convicted of one or more felonies other than the present charge that involved the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel and that it involved torture or serious physical abuse beyond that necessary to produce death; (3) the murder was knowingly committed, solicited, directed, or aided by Defendant while he had a substantial role in committing robbery; (4) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of Defendant or another; (5) Defendant committed mass murder, defined as the murder of three or more persons whether committed in a single criminal episode or at different times within a forty-eight month period. *See* T.C.A. § 39-13-204(i)(2), (5), (6), (7), (12). The jury unanimously found the same five statutory aggravating circumstances for the murder of Mr. James with the additional statutory aggravating factor that the victim was 70 years of age or older. *See id.* at (i)(14). The jury set Defendant's sentence as death.

## ANALYSIS

Defendant raises the following issues on appeal:[4] (1) the trial court erred by allowing Defendant to represent himself; (2) the trial court erred in denying Defendant's motion for mistrial after the trial court allowed elbow counsel to take over the defense; (3) the trial court erred by failing to appoint a second attorney to assist elbow counsel after Defendant requested that he be represented by counsel; (4) the trial court erred by finding Mr. Young was "unavailable" under the Tennessee Rules of Evidence and then further compounded the error by instructing the jury that Defendant could have had a continuance for the State to locate Mr. Young; (5) the trial court erred in allowing testimony regarding the alleged rape of Mr. Young by Defendant; (6) the trial court erred by admitting photographs of the victims' bodies and wounds in violation of Tennessee Rule of Evidence 403; (7) the trial court erred by overruling elbow counsel's objection to the prosecutor confronting Defendant in closing argument; (8) the evidence was insufficient to support the convictions; (9) the trial court erred in denying Defendant a mitigation expert or investigator in preparation for sentencing; and (10) the death sentence is arbitrary and disproportionate.

---

[4] We have renumbered and reordered the issues as presented in Defendant's brief on appeal for purposes of our analysis.

I.  The Right to Counsel and the Right to Self-Representation

A.  Allowing Defendant to Proceed Pro Se

Defendant argues that the trial court erred by allowing him to proceed pro se at trial and that the trial court should have forced Defendant to accept representation by counsel.  The State, on the other hand, insists that the trial court properly determined that Defendant waived his right to representation by an attorney.

Defendant cites no authority in his brief illustrating a scenario in which this Court has forced a competent defendant to accept counsel against his will.  To the contrary, our Supreme Court has specifically held that "Article I, Section 9 of the Tennessee Constitution and the Sixth Amendment to the United States Constitution guarantee not only a right of the accused to be represented by counsel but also a right to self-representation."  *State v. Hester*, 324 S.W.3d 1, 30 (Tenn. 2010) (citing *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999)).  For a defendant to exercise his or her right of self-representation at the trial stage of the proceedings: (1) a defendant must make the request in a timely manner; (2) the assertion of the right of self-representation must be clear and unequivocal; and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel.  *Id.* (citing *State v. McCary*, 119 S.W.3d 226, 256 (Tenn. Crim. App. 2003); *State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988)).

Shortly after his case was remanded from our supreme court, Defendant asserted his right to self-representation through a ten-page handwritten "Motion to Withdraw/waive Court Appointed Attorneys."  The motion filed by Defendant was made in a timely manner, and it clearly and unequivocally sets out his desire to represent himself.  When presented with this motion, the trial court thoroughly questioned Defendant about his knowledge and experience with the legal system.  During this questioning, the record reflects that the trial court raised all necessary issues and asked the necessary questions for waiver of counsel as set out in Rule 44(b) of the Tennessee Rules of Criminal Procedure and as set out by the Supreme Court in *Johnson v. Zerbst*, 304 U.S. 458 (1938), and *Von Moltke v. Gillies*, 332 U.S. 708 (1948).  The trial court's questioning of Defendant, satisfied the requirement that the waiver of counsel be knowing and intelligent.  Therefore, the requirements for self-representation as set out in *Hester* were fulfilled by the actions of Defendant and the trial court.

Now, on appeal, Defendant seeks relief from this Court as a direct result of his own intentional actions.  Defendant makes no allegations that he sought and was denied counsel by the trial court or that Defendant was not allowed counsel of his choosing.  Rather, on multiple occasions, Defendant specifically stated his desire to represent

himself and rebuffed every attempt by the trial court to encourage him to accept representation. The record supports the noble efforts made by the trial courts to convince Defendant of the folly in self-representation.[5] Essentially, Defendant's argument on appeal would require this Court to create a new rule of law that would strip the right to self-representation from a defendant in a capital matter. Currently, a defendant retains their right to self-representation even when being tried for a capital offense. *Hester*, 324 S.W.3d at 32. We refuse to make such a daffy ruling that would limit the constitutional rights of the accused in a capital matter. The argument presented by Defendant has no basis in either the state or federal constitution. Defendant is not entitled to relief on this issue.

### B. Denial of a Motion for Mistrial

Just prior to the State's final trial witness, Defendant asked for elbow counsel to handle the remainder of the trial. Following the close of the State's proof, elbow counsel moved for a mistrial, arguing that Defendant should not have been allowed to represent himself. Defendant argues that the trial court erred in refusing to grant the mistrial requested by elbow counsel. The State insists that the trial court properly denied the request for a mistrial.

The decision whether to grant a mistrial is within the discretion of the trial court, whose decision will not be disturbed on appeal unless there was an abuse of that discretion. *State v. Hall*, 667 S.W.2d 507, 510 (Tenn. Crim. App. 1983). The purpose of a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

While counsel was placed in an undesirable position of taking over mid-trial, there were no facts or occurrences that would have precluded an impartial verdict. Counsel may have felt that the trial would have gone differently had he been fully representing Defendant from the get-go, but that does not rise to the level of finding that the trial court abused its discretion in denying the motion for mistrial. To declare a mistrial for this reason would provide a roadmap for every future defendant to delay their trial infinitely by initially refusing counsel, reconsidering halfway through trial, and then obtaining a mistrial by reasserting their right to counsel. "Nothing is better settled than the rule that an appellant cannot take advantage of errors which he committed, invited or induced the trial court to commit." *State v. Jones*, 733 S.W.2d 517, 521 (Tenn. Crim. App. 1987) (citing *Gentry v. Betty Lou Bakeries*, 100 S.W.2d 230, 231 (Tenn. 1937)). In fact, "[a]

---

[5] The technical records reflect that the trial court requested that Defendant accept the representation of counsel during pre-trial report dates on January 9, January 30, February 11, February 23, February 26, March 23, and April 2, 2015.

reversal under these circumstances would place Defendant in charge of the trial rather than the trial judge." *Jones*, 733 S.W.2d at 522. Defendant will not be allowed to take advantage of a situation which he himself created. *Id.* Defendant is not entitled to relief on this issue.

### C. Refusal to Appoint a Second Attorney to Assist in his Defense

As discussed above, Defendant waived his right to be represented by counsel on multiple occasions. When Defendant decided to forgo pro se representation and relinquished the trial back to elbow counsel, counsel requested the appointment of an additional attorney to assist him with the trial. The trial court denied the request of counsel and instructed him to continue with the trial. On appeal, Defendant argues that the trial court erred by failing to appoint a second attorney to assist in his defense. Specifically, Defendant alleges that the refusal to appoint a second attorney to represent him at trial violates his rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, sections 8 and 9 of the Tennessee Constitution. The State insists that because Defendant knowingly waived his right to counsel, he was not entitled to have the trial court appoint a second attorney to assist in his defense.

Tennessee Supreme Court Rule 13, section 3(b)(1) states that "[t]he court shall appoint two attorneys to represent a defendant at trial in a capital case." As valuable as two attorneys may be in a capital case, this rule is not a rule of constitutional dimension. Defendants facing the death penalty do not have a per se constitutional right to the assistance of two attorneys. *Hester*, 324 S.W.3d at 35; *Bell v. Watkins,* 692 F.2d 999, 1009 (5th Cir. 1982); *Arrington v. State*, 687 S.E.2d 438, 448 (Ga. 2009); *Davis v. State*, 743 So.2d 326, 340-41 (Miss. 1999). The right to counsel is not a license to abuse the dignity of the court or to frustrate orderly proceedings. *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000).[6] Defendant knowingly and intelligently waived his constitutional

---

[6] *See also United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1998) ("[R]ight [to counsel] must not obstruct orderly judicial procedure and deprive courts of the exercise of their inherent power to control the administration of justice."); *United States v. Flewitt*, 874 F.2d 669, 674 (9th Cir. 1989) ("The right to self-representation is not a license to abuse the dignity of the courtroom."); *Berry v. Lockhart*, 873 F.2d 1168, 1171 (8th Cir. 1989) ("A defendant has no right to manipulate his right to counsel in order to delay or disrupt the trial."); *United States v. Fowler*, 605 F.2d 181, 183 (5th Cir. 1979) ("The right to assistance of counsel, cherished and fundamental though it be, may not be put to service as a means of delaying or trifling with the court."); *United States v. White*, 529 F.2d 1390, 1393 (8th Cir. 1976) ("Of course, the right to counsel is a shield, not a sword. A defendant has no right to manipulate his right for the purpose of delaying and disrupting the trial."); *Brooks v. State*, 819 S.W.2d 288, 290 (Ark. Ct. App. 1991) ("[T]he constitutional right to counsel is a shield, not a sword, and . . . a defendant may not manipulate this right for the purpose of delaying the trial or playing 'cat-and-mouse' with the court."); *Jones v. State*, 449 So. 2d 253, 258 (Fla. 1984) ("We consider it implicit . . . that the right to appointed counsel, like the obverse right to self-representation, is not a license to abuse the dignity of the court or to

right to appointed counsel. This waiver necessarily includes the waiver of the statutory right to two attorneys as set out in Tennessee Supreme Court Rule 13. The trial court did not err in refusing to appoint additional counsel.

## II. Testimony of Mr. Young

### A. Unavailability of Mr. Young

Defendant argues on appeal that the trial court erred in finding Mr. Young unavailable to testify at trial. Specifically, Defendant takes issue with the admission of Mr. Young's prior testimony because, in his view, there was no showing that the State made a good faith effort to locate Mr. Young prior to trial. Instead, Defendant contends the State put forth a "lack luster" effort to find the witness. The State contends that because they could not secure Mr. Young's presence, the trial court did not abuse its discretion in determining that he was unavailable for trial.

Defendant did not specifically object to the finding of the unavailability of Mr. Young; however, Defendant objected to the introduction of Mr. Young's former testimony on the basis that he would be unable to cross-examine the witness. While not specifically raising the issue at trial that he raises on appeal, we determine Defendant preserved his right to appeal through objection.

As a general rule, hearsay is inadmissible at trial unless otherwise provided by the rules or by law. Tenn. R. Evid. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). The admissibility of prior testimony is governed by Tennessee Rule of Evidence 804, which allows a hearsay exception for the prior testimony of a person who is unavailable as a witness if the testimony was "given as a witness at another hearing of the same or a different proceeding . . . , if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). However, to use the testimony from the prior proceeding, the party seeking to introduce the testimony must establish that the witness "[i]s absent from the hearing and

---

frustrate orderly proceedings. . . ."); *State v. Green*, 471 N.W.2d 402, 407 (Neb. 1991) ("A defendant may not utilize his or her right to counsel to manipulate or obstruct the orderly procedure in the court or to interfere with the fair administration of justice."); *State v. Montgomery*, 530 S.E.2d 66, 69 (N.C. Ct. App. 2000) ("[A]n accused may lose his constitutional right to be represented by counsel of his choice when he perverts that right to a weapon for the purpose of obstructing and delaying his trial."); *Painter v. State*, 762 P.2d 990, 992 (Okla. Crim. App. 1992) ("The right to assistance of counsel may not be put to service as a means of delaying or trifling with the court."); *Cf. Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("The right of self-representation is not a license to abuse the dignity of the courtroom.").

the proponent of [the] statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Tennessee Constitution also guarantees the right of confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face[.]" Tenn. Const. art. I, § 9. Although the language of the federal and state constitutional provisions differs slightly, the Tennessee Supreme Court has "traditionally adopted and applied the standards enunciated by the United States Supreme Court" when determining an accused's right to confrontation under the Tennessee Constitution. *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008).

The United States Supreme Court has interpreted the Confrontation Clause to bar admission of certain out-of-court statements unless: (1) the witness was unavailable to testify; and (2) the defendant had been given a previous opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 35, 53–54 (2004). This bar applies only to statements defined by law as testimonial hearsay. *Id.*; *see also State v. George Anthony Bell*, No. M2008-01187-CCA-R3-CD, 2009 WL 3925370, at *5 (Tenn. Crim. App. Nov. 19, 2009). A testimonial statement "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact'" and includes "statements that were made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52. The Supreme Court has stated that reliability of a prior testimonial statement is shown exclusively via cross-examination. *Crawford*, 541 U.S. at 61. The standard of review of a trial court's determination of the unavailability of a witness is an abuse of discretion standard. *See State v. Summers*, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004); *State v. Bigbee*, 885 S.W.2d 797, 806 (Tenn. 1994); *Hicks v. State*, 499 S.W.2d 174, 179 (Tenn. Crim App. 1972).

On appeal, the State set out the following efforts to locate Mr. Young prior to trial:[7]

> On April 13, 2015, the State filed a 'Petition and Affidavit of the State of Tennessee to Secure Attendance of Witness from Without the State of Tennessee.' The State indicated that [Mr.] Young was 'a necessary and material witness' for [D]efendant's trial. On the same date, the trial court entered a certificate stating that Mr. Young was 'a necessary and material witness for the State of Tennessee' and that his presence was required in

---

[7] These filings appear in the technical record on appeal.

- 17 -

court on May 11-15, 2015. The certificate provided an address for [D]efendant in Miami Gardens, Florida.

On May 4, 2015, the State filed another petition to secure the attendance of [Mr.] Young at [D]efendant's trial. The petition indicated that [Mr.] Young was living in Hollywood, Florida. On the same date, the trial court issued another certificate, again finding that [Mr.] Young was 'a necessary and material witness' for [D]efendant's trial. The [trial] court stated that [Mr.] Young appeared to be evading service of process on this case in another county in Florida and had indicated his unwillingness to appear and testify. Thus, the [trial] court ordered that [Mr.] Young be immediately taken into custody and delivered to Tennessee.

On May 7, 2015, the [trial] court entered an order to transport [Mr.] Young to the court proceedings. The order provided that [Mr. Young] was residing in Florida and that the laws of that state provide for the rendition of necessary and material witnesses to sister states. According to the order, the Circuit Court of the Eleventh Judicial District in Miami, Dade County, Florida had received the certificate issued by the trial court in this case and issued a summons for [Mr.] Young. However, the Florida court found that [Mr.] Young was 'actively evading service of the summons to appear.' The summons was served on [Mr.] Young's mother, but [Mr.] Young failed to appear in the Florida Court pursuant to that summons. Thus, the Florida court, on May 6, 2015, ordered [Mr.] Young's arrest. The Tennessee order provided that, in the event [Mr.] Young was arrested pursuant to the Florida court's order, the Shelby County Sheriff's Department would immediately take custody of him and transport him to [D]efendant's trial.

On May 11, 2015, the State filed a motion for the introduction of [Mr.] Young's testimony from [D]efendant's first trial on the ground that [Mr.] Young was unavailable. At a hearing on the same date, the prosecutor stated that he had spoken to [Mr.] Young, who had indicated that he was not going to testify. The prosecutor explained that the State had attempted to serve [Mr.] Young but had been unable to locate him. The State had been in contact with multiple jurisdictions in Florida, who were all looking for [Mr.] Young. The prosecutor noted that a Miami court had entered an order finding that [Mr.] Young was intentionally evading the service of process and had issued a warrant for his arrest. Additionally, [Mr.] Young's picture was in the local paper. The prosecutor explained that [Mr.] Young could not be located and that it was unaware of any other efforts it could make to acquire him. The trial court noted that a Florida court had issued a warrant to have [Mr.] Young taken into custody.

[D]efendant argued that he had a right to face his accuser. The court, indicating that [Mr.] Young was unavailable, noted that there were procedures by which the trial court [could] proceed without [Mr.] Young's presence. The following day, [D]efendant filed a motion objecting to the use of [Mr.] Young's previous testimony.

On May 14, 2015, during a jury-out hearing at trial, the prosecutor explained that the State had continued to search for [Mr.] Young and had come close to catching him a couple of days earlier in Fort Lauderdale. The prosecutors spoke to a State Attorney in Florida earlier that day who indicated that they were still searching for [Mr.] Young. The State asked to admit [Mr.] Young's testimony from [D]efendant's prior trial in 2009. The prosecutor provided copies of the transcripts to Defendant and elbow counsel and argued that the issues in the previous trial were identical to those in this trial.

(internal footnotes omitted).

Defendant argues that because the trial was scheduled to start in December of 2014 and Mr. Young was housed with the Tennessee Department of Corrections until January 5, 2015, the State should have made arrangements to secure Mr. Young's presence at trial. There is no evidence in the record to support Defendant's argument or to establish that Mr. Young was still housed by the Tennessee Department of Corrections in January of 2015. However, there is evidence in the record of a "Motion to Allow Use of Transcript of Prior Testimony of Unavailable Witness" that contains multiple emails between the State of Tennessee and the State of Florida evidencing the countless attempts to locate Mr. Young, a court order from Florida ordering the arrest of Mr. Young, and even a copy of the newspaper/internet article seeking the public's help in locating Mr. Young. In other words, the record establishes that the State made multiple good faith efforts to locate and procure Mr. Young's presence for trial. The trial court did not abuse its discretion in determining Mr. Young was unavailable for trial. Defendant is not entitled to relief on this issue.

### B. Jury Instruction on Continuance

Defendant also alleges that the trial court erred by instructing the jury that Defendant objected to a continuance for the State to try to locate Mr. Young. The State disagrees. The State contends that Defendant caused the error by requesting that the jury be given information in regards to the evading of service by Mr. Young and, thus, has waived any error on appeal.

Prior to the introduction of Mr. Young's former testimony, Defendant asked the trial court if it was going to inform the jury why Mr. Young was not present at trial. The trial court informed Defendant that it was not going to give the jury any additional information. The defense then sought to introduce evidence to the jury that Mr. Young was evading service of process to impugn the credibility of Mr. Young. The State argued that they offered to continue the trial to have more time to find Mr. Young but that Defendant did not agree to the continuance. The State argued that if Defendant was going to be allowed to put on proof of Mr. Young's attempts to evade service, then the State should be allowed to present evidence of their offer to continue the matter. As a result of this argument, the trial court gave the following jury instruction regarding the unavailability of Mr. Young:

> Now, ladies and gentlemen, that's a document that pertains to the efforts to obtain the appearance of Mr. Young here in court. I've already told you previously that as a matter of law[,] I have ruled that Mr. Young's transcript of his prior sworn testimony could be admitted into evidence because it fell within what we call a well[-]recognized exception to the hearsay rule when a witness is unavailable. Mr. Young was unavailable. The State made what we call under the law a diligent and good faith effort to produce Mr. Young through service of process but was unable to do so at the time of this trial. And since that made him legally unavailable for the trial and since he had given his testimony prior in a court in which he was sworn to tell the truth and which [Defendant] was a party and had counsel there cross examining and confronting that witness[,] then that made it legally admissible. Also, we decided to go through as far as the good faith efforts of the [S]tate are concerned, at the time this case was set for trial, the [S]tate offered to continue to try to look for him and continue the case for a few weeks in order to try to find him[,] but it was Defendant who insisted to go to trial this week with Mr. Young not being able to be served at this time. And beyond that, that's really all I think I want to tell you about the legal rulings.

Neither side offers any case law to support their arguments. Thus, ordinarily, the issue would be waived. Tenn. Ct. Crim. App. R. 10(b). However, the trial court merely informed the jury that the State could not find the witness and that Defendant would not agree to a continuance. Defendant argues that the trial court placed the burden of finding a witness for the State on Defendant and then blamed him for not agreeing to a continuance when the State could not find the witness. The State's argument that Defendant caused this error through his request is not accurate because Defendant's request that the jury be informed that the witness was evading service was never acted on. The trial court simply again told the jury that the State could not find the witness while reiterating his finding of unavailability and without making any statements with regard to

the intentional evasion of service. While we feel that the trial court diminutively erred by instructing the jury in such a manner, we have carefully examined the entire record and find that this error did not result in prejudice to the process of the jury reaching its verdict. This error would not rise to the level of reversible error. No instruction given by the trial court was untrue or even misleading. Defendant is not entitled to relief on this issue.

### C. Testimony Regarding Defendant's Rape of Mr. Young

Next, Defendant alleges that the trial court should not have allowed the portion of Mr. Young's testimony wherein he claimed that he was raped by Defendant to be read into evidence. The State insists that Defendant has waived the issue for failure to object or request a jury-out hearing.

At trial, after Mr. Young was deemed unavailable, his testimony from Defendant's first trial was read into evidence. While portions of the testimony relating to the murder in Florida were redacted,[8] Mr. Young's testimony that Defendant raped him was not. Defendant certainly had prior knowledge of the substance of the testimony and ample opportunity to review the transcript. Defendant did not object to this evidence. Therefore, this issue is waived. *See* Tenn. R. App. P. 36(a).

Moreover, we decline to review the issue for plain error. For an appellate court to find plain error: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the test established by *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Defendant must prove all five factors before this Court will review an issue for plain error; complete review is not necessary when the record shows that one of the factors may not be established. *Id*. at 283.

Defendant argues that the rape is a "prior bad act" which would be excluded under Rule 404(b) of the Tennessee Rules of Evidence. Even assuming that the evidence was inadmissible under 404(b), there is no showing that a substantial right of the accused was adversely affected by the introduction of the testimony concerning the rape. The State presented overwhelming evidence of Defendant's guilt. Thus, we will not review the matter for plain error. Defendant is not entitled to relief on this issue.

---

[3] These portions were redacted on the basis that the introduction of information about the Florida murder led to the reversal of Defendant's first convictions and new trial.

### III.  Admission of Autopsy Photographs into Evidence

Defendant asserts the trial court erred in admitting autopsy photographs of Mr. and Mrs. James through the testimony of Dr. Chancellor.  Specifically, Defendant refers to the "horrific injuries" highlighted in the photographs that were merely introduced to inflame the jury.  The State defers to the trial court's discretion on the matter.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Tenn. R. Evid. 403.  The trial court must determine the relevance of the visual evidence and weigh its probative value against any undue prejudice.  *Carruthers*, 35 S.W.3d at 577.  The term "undue prejudice" has been defined "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes).  In *Banks*, our supreme court provided the trial courts with guidance for determining the admissibility of relevant photographic evidence.  The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.  *Id.* at 951.  The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion.  *Carruthers*, 35 S.W.3d at 576-77; *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *Banks*, 564 S.W.2d at 949.  As our supreme court stated in *Carruthers*, the modern trend is to vest more discretion in the trial court's rulings on admissibility.  *Carruthers*, 35 S.W.3d at 577 (citing *Banks*, 564 S.W.2d at 949).

Prior to Dr. Chancellor's testimony at trial, defense counsel objected to the autopsy photographs of the victims as inflammatory, overly prejudicial, and cumulative.  During a bench conference, the State presented photographs of both Mr. and Mrs. James that they planned to introduce.  The State sought to introduce photographs of lacerations on different areas of Mrs. James's neck, arm, and wrist, bruises on her arm, and pressure marks on her ring finger.  Defense counsel did not object to the admission of the photographs of Mrs. James's finger.  The prosecutors also presented photographs of cuts on Mr. James's neck and arm, a photograph of his eye, a photograph of bruising on his shoulder and wrist, and a photograph of his rib bones.  The State maintained the photographs of the neck wounds were necessary to prove premeditation, establish that the same person killed each of the victims, and assist in the jury's understanding of the

testimony of Dr. Chancellor. The trial court admitted the photographs, finding that Rule 403 is a "rule of inclusion." The court noted that many of the photographs were not "graphic" but admitted that the pictures depicting the wounds to the throats of the victims could be deemed inflammatory. However, the trial court determined that the probative value of the photographs outweighed their prejudicial nature, the pictures illustrated the State's case, and the State has "a right to do that." The trial court found the photographs were admissible and relevant to the issues to be determined by the jury.

We have reviewed the photographs in question, and conclude they are not so sensational as to be out of the ordinary of what would be expected of autopsy photographs of a victim with knife wounds. Additionally, Dr. Chancellor testified as to the necessity of the photographs to allow her to explain to the jury the wounds suffered by the victims. We conclude that the probative value of the photographs outweighs their prejudicial effect and the trial court did not abuse its discretion in allowing their admission. Defendant is not entitled to relief on this issue.

IV. Tone of the Prosecutor During Closing Arguments

Defendant argues that the trial court erred in overruling an objection to the "tone and volume" used by the State during closing argument. Specifically, Defendant contends that his right to due process was violated when counsel for the State was "standing three feet from him and pointing at him and yelling at him." Despite his objection at trial, Defendant fails to adequately explain on appeal a basis for the overturning of a conviction based upon a prosecutor's method of presenting a closing argument.

While the scope and depth of closing argument is generally a matter within the trial court's discretion, *Bigbee*, 885 S.W.2d at 809, the State is not free to do what they wish. Arguments are required to be "temperate, based upon the evidence at trial, relevant to the issues being tried, and not otherwise improper under the facts of the law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). Although not exhaustive, this Court has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *Goltz*, 111 S.W. 3d at 6. However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or

improper that it affected the outcome of the trial to the defendant's prejudice." *Id.* In other words, it will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict. *See State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005). We use the following factors when making this determination:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6. However, the analysis set out in *Judge* applied to an improper statement and made no mention of the volume or tone of an argument. *See Judge*, 539 S.W.2d at 344.

Trial counsel for Defendant failed to adequately preserve any proof of the actions of the prosecutor other than stating in the objection that the prosecutor was yelling. The trial court did not note the volume or tone, nor did the trial court ask counsel for the State to step away from Defendant. In Defendant's appellate brief, there is only one reference to the record in his argument on this issue and no mention of any authority that bears on the issue of the tone and volume of the prosecutor during closing argument. Defendant is required on appeal to make appropriate references to the record in the argument portion of his brief and to cite relevant authority. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Failure to do so will ordinarily constitute a waiver of the issue. *See State v. Hammons*, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Under these circumstances, it is not the obligation of an appellate court to review this issue as it is presented. *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). There is not enough evidence before this Court to adequately review the allegations much less overturn a conviction. Defendant has waived this issue.

V. Sufficiency of the Evidence

Defendant argues the evidence is insufficient to support his convictions. Specifically, Defendant claims that Mr. Young's testimony is not sufficiently corroborated. This issue was raised on the earlier appeal with essentially identical evidence and relief was denied by both this Court and our Supreme Court.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is

whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *Smith*, 24 S.W.3d at 279). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). This section further defines premeditation as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a

weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660. This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any" robbery. T.C.A. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103.

We note "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *Bigbee*, 885 S.W.2d at 803; *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014). Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, the longstanding rule has been that only slight corroboration is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). By way of explanation, our supreme court has stated:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

To the extent Defendant challenges the State's proof of his identity, we acknowledge that "[t]he identity of the perpetrator is an essential element of any crime." *State v. Robert Wayne Pryor*, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)), *no perm. app. filed*. The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." *Id.* (citing *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Here, the trial court instructed the jury that they were to determine first whether Mr. Young was an accomplice. Then, if the jury determined that Mr. Young was an accomplice, there must be other corroborating evidence to support his testimony. Looking at the evidence presented at trial in a light most favorable to the State, Mr. Young testified in detail about Defendant's robbing and killing the victims. In addition, Mr. Young gave extensive testimony as to the actions of Defendant both before and after the homicides.

Wesley and Diane Armstrong of Bartlett, Tennessee, confirmed that Defendant visited both their residence and Mr. Armstrong's place of employment in August of 2003. The Armstrongs testified that Defendant was accompanied by an unknown person whom they described as a skinny African American male with braided hair—a description that would closely resemble Mr. Young. The testimony of both Mr. and Mrs. Armstrong is consistent with Mr. Young's testimony as to the events leading up to the murders.

Christopher Stallion testified that at approximately 1:00 p.m. on the date of the murders, he saw two African American men standing with Mr. James near his garage. This is consistent with Mr. Young's testimony that he and Defendant had talked with Mr. James in front of the James's garage prior to the murders.

Dr. Karen Chancellor corroborated Mr. Young's testimony as to both the nature of the injuries sustained by Mr. and Mrs. James and the manner in which they were murdered. Both Mr. and Mrs. James sustained incision wounds to the neck and displayed signs of strangulation and bondage, all of which was consistent with Mr. Young's testimony. Abrasions were found that were compatible with the forcible removal of rings from Mrs. James's fingers, as Mr. Young testified Defendant had done.

Mr. Young testified that just after the murder and several times during their drive back to Florida, Defendant used a credit card stolen from the victims to purchase gas.

The State introduced records confirming the use of Mrs. James's card at a gas station in Memphis at 3:18 p.m. on the date of the murders. The State also produced documentation of purchases made with the same credit card on the night of the murders and over the following two days at several gas stations in Mississippi and Florida. Surveillance video from a gas station in Batesville, Mississippi, at approximately 8:00 p.m. on the day of the murders depicted a Dodge Aries matching that owned by Defendant. Video from a gas station in Madison, Mississippi, taken on the same date at approximately 11:00 p.m., showed an African American male with a yellow shirt. Mr. Young testified that Defendant purchased a yellow long sleeved shirt at JC Penney. The Madison video showed that the man in the yellow shirt exited and then reentered a Lincoln Town Car, and also showed that the Lincoln, upon leaving the station, was followed by a Dodge Aries.

Michael Smith, the owner of a used car dealership in Mississippi, confirmed Mr. Young's testimony that Defendant paid cash for the Lincoln Town Car shortly after the murders. Detective Carlos Reyes verified Mr. Young's testimony that he was stopped and arrested in Brevard County, Florida, and that Defendant returned to the place of the stop to acknowledge his ownership of the car driven by Mr. Young. Further, during a search of Defendant's Lincoln, Florida officers discovered a ring which was later identified by Margaret Coleman as belonging to Mrs. James.

All of this evidence corroborated Mr. Young's testimony as to what had occurred before, during, and after the murders of Mr. and Mrs. James. The evidence is sufficient to support the convictions. Defendant is not entitled to relief on this issue.

## VI. Denial of a Mitigation Expert/Investigator

Defendant argues that the trial court erred in denying his request to retain a mitigation expert to develop mitigation evidence in preparation for sentencing. The State counters that Defendant failed to "establish a particularized need for such funding," and thus, the trial court did not abuse its discretion in denying the request.

The determination of whether or not to approve the funding of expert services to an indigent capital defendant is entrusted to the discretion of the trial court. *State v. Cazes*, 875 S.W.3d 253, 261 (Tenn. 1994) (citing T.C.A. § 40-14-207(b)). Further, Tennessee Supreme Court Rule 13 states in part:

> In the trial and direct appeal of all criminal cases in which Defendant is entitled to appointed counsel . . . the court, in an ex parte hearing, may *in its discretion* determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. . .

Tenn. Sup. Ct. R. 13, §5(a)(1) (emphasis added). The defendant must make a specific showing that the requested services are necessary to protect the defendant's constitutional rights. *Id.*; *Cazes*, 875 S.W.3d at 261. Further, the court must determine that "there is a particularized need for the requested services." Tenn. Sup. Ct. R. 13, §5(c)(1). "Particularized need in the context of criminal trials and appeals is established when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect Defendant's right to a fair trial." *Id*. at §5(c)(2); *see State v. Barnett*, 909 S.W.3d 423, 431 (Tenn. 1995). This Court will review the trial court's decision for an abuse of discretion.

The appellate record does not contain either a copy of the motion for funding to retain a mitigation expert or a transcript of any hearing on the motion. The only mention of this motion in the record is the order of the trial court denying the motion of Defendant entered on December 1, 2014. With no record to review, this Court cannot make a determination of the particularized need for the requested expert or if Defendant made a specific showing of the necessity of the requested services. Defendant bears the burden of preparing "a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis for the appeal." *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) (citing Tenn. R. App. P. 24(b); *State v. Miller*, 737 S.W.2d 556, 568 (Tenn. Crim. App. 1987)). Absent an adequate appellate record to review, this Court must presume that the trial court's findings were correct and that the trial court did not abuse its discretion in ruling on the motion. *Id.*

Notwithstanding the lack of the record on this matter, the refusal of the trial court to grant funds for a mitigation expert did not completely forestall the rights of Defendant at trial. Defendant had available to him the mitigation evidence prepared for the initial trial in this matter. Prior to his discharge of counsel during sentencing, counsel for Defendant and the State had reached an agreement to allow the mitigation testimony from the first trial to be read into evidence without objection. At this point, Defendant reiterated his right to represent himself and sought to relieve counsel yet again. After being allowed to proceed with sentencing pro se, Defendant waived his right to present mitigation evidence. Notwithstanding the actions of the trial court, Defendant had mitigation evidence available to use for his behalf and knowingly chose not to use the available evidence or present any type of mitigation defense. Defendant is not entitled to relief on this issue.

VII. Mandatory Review

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1) requires this Court to review the record to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Defendant argues that the death sentence in this matter was imposed in an arbitrary manner in violation of subsection (A) because Defendant was denied a mitigation expert to adequately prepare mitigation evidence for the penalty phase of the trial. As was discussed earlier, this issue was waived. The failure to preserve this issue for appeal notwithstanding, Defendant specifically waived the presentation of mitigation evidence at sentencing. Moreover, Defendant had access to the mitigation evidence prepared for the first trial at his disposal and chose not to utilize it. Defendant did not address any of the other areas of mandatory review on appeal. However, because review is mandatory, we will discuss them in detail below.

### A. The sentence of death was imposed in any arbitrary fashion

The death penalty is not imposed in an arbitrary fashion if the defendant's trial "was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure." *State v. Young*, 196 S.W.3d 85, 115 (Tenn. 2006). A review of the record indicates that the trial court conducted the trial according to the laws and procedures of the State of Tennessee. The jury reached a unanimous verdict beyond a reasonable doubt that Defendant committed the crimes for which he was charged. Additionally, the jury reached the unanimous decision beyond a reasonable doubt that the aggravating circumstances outweighed any mitigating circumstances. Defendant's sentences of death were not imposed in an arbitrary fashion.

### B. The evidence supports the jury's finding of statutory aggravating circumstance or circumstances

In reviewing the evidence in regard to the jury's findings of statutory aggravating circumstances, this Court must view the evidence in a light most favorable to the State and determine whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006).

### (i)(14) Seventy Years of Age or Older

The jury specifically determined that Mr. James was 70 years of age or older. *See* T.C.A. §39-13-204(i)(14). Dr. Chancellor testified that Mr. James was 81 years of age at the time of his death. This testimony was undisputed by Defendant and was sufficient to support the aggravating factor related to the age of the victim.

### (i)(2) Prior Violent Felony Convictions

With regard to both victims, the jury found that Defendant "was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." *See* T.C.A. § 39-13-204(i)(2). During the sentencing phase of the trial, the State introduced certified copies of five prior violent felony convictions from the State of Florida for two counts of battery on a law enforcement officer and one count each of aggravated burglary, robbery, and kidnapping. In addition to the certified copies of the Florida convictions, testimony was presented that Defendant was convicted in Florida for the first degree murder of Carlos Perez on August 26, 2003. The introduction of the certified copies of convictions, coupled with the testimony regarding Defendant's conviction for first degree murder, are sufficient to establish Defendant's prior violent felony convictions.

### (i)(5): Heinous, Atrocious, or Cruel

The jury also found that the murders of both victims were "especially heinous, atrocious, or cruel in that [they] involved torture or serious physical abuse beyond that necessary to produce death." *See* T.C.A. § 39-13-204(i)(5). Torture has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Rollins*, 188 S.W.3d at 572 (quoting *State v. Pike*, 978 S.W.2d 904, 917 (Tenn. 1998); *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985)). A defendant's actions in causing the victim to fear death or physical harm is a factor in whether Defendant created the severe mental pain or anguish relevant to a finding of torture. *State v. Jordan*, 325 S.W.3d 1, 68 (Tenn. 2010).

The evidence presented at trial indicated that the victims were bound, strangled, stabbed, and had their throats slashed. Testimony from the medical examiner indicated that some of the incisions were so deep as to strike bone. The autopsy revealed that Mr.

James was stomped so hard that he had multiple fractures of his ribs and spine. All of the injuries were established to be greater than that necessary to produce death. Further, the evidence indicated that Defendant moved Mrs. James throughout different rooms in the house, bound her, and taunted her with threats. All of this evidence is sufficient to establish the heinous, atrocious, or cruel aggravating circumstance as to the murders of both victims.

### (i)(7) Murder Was Committed During a Robbery

The jury found that the murders were committed during the course of a robbery. *See* T.C.A. §39-13-204(i)(7). Testimony was presented at trial that jewelry belonging to Mrs. James was found in Defendant's car in Florida. Additionally, Mr. Young testified that Defendant removed certain items from the home, including a ring from the finger of Mrs. James. Thus, there was ample evidence to establish that Defendant killed the victims in the course of a robbery to satisfy this aggravating factor.

### (i)(6) Murder was Committed to Avoid, Interfere or Prevent Lawful Arrest or Prosecution

The fourth aggravating factor found by the jury was that the murders were committed for the purpose of avoiding, interfering with or preventing lawful arrest or prosecution of Defendant. *See* T.C.A. §39-13-204(i)(6). While it need not be the sole motive in committing the murder, "there must be some 'particular proof' that Defendant murdered the victim at least in part to avoid apprehension." *Jordan*, 325 S.W.3d at 72 (quoting *State v. Hartman*, 42 S.W.3d 44, 58 (Tenn. 2001). Through the testimony of Mr. Young, the State established that Defendant killed Mrs. James "because she had seen [his] face." While no explicit evidence was entered that Defendant made such a statement as to Mr. James, there was proof that Defendant had a conversation with Mr. James prior to the murder, so this aggravating factor could be applied to Mr. James as well. There was ample evidence presented that a purpose of the murders was to prevent identification of Defendant in order to hinder prosecution or arrest for the robbery.

### (i)(12) Defendant Committed Mass Murder

Finally, the jury found that Defendant had committed mass murder by killing three or more people within a forty-eight month period. *See* T.C.A. §39-13-204(i)(12). Primarily, the jury found Defendant guilty of committing the two murders of Mr. and Mrs. James on August 22, 2003. The State then introduced evidence and testimony of Defendant's conviction for the murder of Carlos Perez which occurred on August 26, 2003, just days after the murder of Mr. and Mrs. James. The evidence presented at trial as to Mr. and Mrs. James, coupled with the proof of the murder of Carlos Perez in Florida some four days later, provide sufficient evidence for the jury to determine that Defendant had committed mass murder.

C.  The evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances

The next portion of our mandatory review is an inquiry as to whether a reasonable juror could find beyond a reasonable doubt that the aggravating circumstances proved by the State outweigh any mitigating circumstances as to the circumstances of the crime or the defendant's background.  As addressed previously, the State presented substantial evidence regarding the aggravating factors.  Defendant knowingly waived the presentation of mitigation evidence.  Even with the waiver of the presentation of mitigating evidence by Defendant, the jury was instructed as to mitigating circumstances as follows:

> Tennessee law provides that in arriving at the punishment, the jury shall consider as previously indicated, any mitigating circumstances raised by the evidence which shall include, but are not limited to, the following:
>
> One, the defendant was an accomplice in the murder committed by another person and you may consider whether the defendant's participation was relatively minor;
>
> Two, any lingering or residual doubt you may have as to the defendant's guilt of these offenses;
>
> Three, the sentence received by a co-defendant or an accomplice for any convictions for offenses which relate to the same criminal episode and conduct for which the defendant was convicted of first degree murder;
>
> And [four], any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

We determine based upon the proof presented and the waiver of the presentation of any mitigation evidence that a rational juror could have concluded that the aggravating circumstances outweighed any mitigating circumstances.

D.  The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant

The State argues in its brief that this case is neither unique nor extraordinary when it comes to the imposition of death in first degree murder cases. Defendant disagrees.

The proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D) does not require this Court to function as a super jury to substitute our judgment for that of the jury. *See State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Instead, we are to determine whether the defendant's death sentence "is disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting *Bland*, 958 S.W.2d at 664). The comparable cases for analysis are first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment with the possibility of parole, or death. *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Rimmer*, 250 S.W.3d 12, 35 (Tenn. 2008); *see Rollins*, 188 S.W.3d at 575. We also compare the characteristics of the defendants, including their

> (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation.

*Rimmer*, 250 S.W.3d at 35; *Rollins*, 188 S.W.3d at 575.

In August 2003, Defendant bound Mr. James and beat him, fracturing multiple ribs in the process. He also strangled, stabbed, and cut Mr. James across the neck multiple times. Defendant then bound Mrs. James, pushed her, threw her on the floor, taunted and threatened her, and cut her across the neck multiple times. In addition, Defendant stole items from Mrs. James's purse and removed jewelry from her house and body. When Mr. Young questioned Defendant regarding why he had killed Mrs. James, he said it was because she had seen his face. Defendant attempted to remove evidence from the crime scene as well as taking credit cards, cash, and jewelry. Defendant and Mr. Young went to a mall where they purchased clothing and shoes with proceeds from with

robbery. They changed clothes and discarded the clothing that they had worn during the robbery and murders before fleeing to Florida, with Defendant stopping along the way to purchase a Lincoln Town Car. During the trip, Defendant purchased gasoline using Mrs. James's credit cards.

The Tennessee Supreme Court has upheld a sentence of death in cases that share similarities with this case. *See generally Rollins*, 188 S.W.3d at 559 (defendant stabbed eighty-one-year-old victim during a robbery; aggravating circumstances (i)(5), (i)(6), (i)(7), and (i)(14)); *State v. Leach*, 148 S.W.3d 42 (Tenn. 2004) (defendant beat, stabbed, and strangled two elderly women during a robbery; aggravating circumstances (i)(2), (i)(5), (i)(7), and (i)(14)); *Bane*, 57 S.W.3d at 416 (defendant and companions robbed and murdered elderly man by strangling and asphyxiating him; aggravating circumstances (i)(5) and (i)(6)); *State v. Sims*, 45 S.W.3d 1 (Tenn. 2001) (defendant shot victim during burglary; aggravating circumstances (i)(2), (i)(5), (i)(6), and (i)(7)); *State v. Bush*, 942 S.W.2d 489 (Tenn. 1997) (defendant repeatedly stabbed seventy-nine-year-old woman to death during a burglary; aggravating circumstances (i)(5) and (i)(6)); *State v. Barber*, 753 S.W.2d 659 (Tenn. 1988) (defendant beat elderly woman to death during burglary; aggravating circumstances (i)(5) and (i)(7)); *State v. McNish*, 727 S.W.2d 490 (Tenn. 1987) (defendant bludgeoned seventy-year-old victim to death during a robbery; aggravating circumstance (i)(5)); *State v. Campbell*, 664 S.W.2d 281 (Tenn. 1984) (defendant beat seventy-two-year-old victim to death during robbery; aggravating circumstances (i)(2), (i)(5), and (i)(7)); *State v. Barnes*, 703 S.W.2d 611 (Tenn. 1983) (defendant and companion beat elderly woman during burglary of her home and victim died from pneumonia resulting from beating; aggravating circumstances (i)(2), (i)(5), and (i)(7)); *State v. Strouth*, 620 S.W.2d 467 (Tenn. 1981), and *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981) (companion cases in which defendants received death penalty when elderly store owner's throat was cut during robbery; aggravating circumstances for both were (i)(5) and (i)(7)). With our review of the record in this case and our review of the prior referenced cases in which the death penalty was imposed and upheld, we conclude that the death penalties imposed on Defendant for his murders of Mr. and Mrs. James are not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

After review of the record and applicable law, we have considered Defendant's arguments as to the alleged errors occurring during the trial and conclude Defendant's convictions and death sentences should be affirmed.

_____
TIMOTHY L. EASTER, JUDGE